**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**RACHEL BIJOU,**

      **Plaintiff,**

**v.**                                                              **Case No: 5:24-cv-715-JSM-PRL**

**WILLIAM KIDD and KY TRUCK**
**LINES, LLC,**

      **Defendants.**

_____

### REPORT AND RECOMMENDATION[1]

This personal injury lawsuit arises out of a motor vehicle accident that occurred

on October 2, 2023, on 1-75 Northbound in Marion County, Florida. Defendants took

Plaintiff's deposition on three separate days over the course of two months.[2]

Defendants have filed a motion to dismiss, arguing that Plaintiff's complaint should

be dismissed for fraud based on her perjury through sworn deposition testimony. (Doc.

26). The Court conducted an evidentiary hearing on January 22, 2026, the transcript

of which is incorporated by reference. For the reasons discussed below, I submit that

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

[2] Plaintiff's deposition is filed at Doc. 28. The deposition is filed in three volumes with page numbers running consecutively: Volume 1 was taken on May 12, 2025 (Doc. 28-1); Volume II was taken on June 6, 2025 (Doc. 28-2); and Volume III was from July 10, 2025 (Doc. 28-3).

Defendants' motion to dismiss (Doc. 26) should be denied.

## I.    Legal Standard

The legal standard for dismissal for fraud requires clear and convincing evidence of a deliberate, bad faith scheme to subvert the judicial process. *See, e.g., Chaca v. Transport USA, Inc.*, 78 So. 3d 727, 730  (Fla. App. Ct. 2012); *Bertrand v. Belhomme,* 892 So. 2d 1150, 1153 (Fla. App. Ct. 2005) (defendant must show by clear and convincing evidence that the plaintiff engaged in intentional misconduct that proves an "intent to deceive," or misconduct that was "willful in nature and done in bad faith."). Florida courts have explained that dismissal is appropriate only where "it is established by clear and convincing evidence 'that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." *See Diaz v. Home Depot USA, Inc.,* 196 So. 3d 504, 505 (Fla. App. Ct. 2016).

Because it is the most extraordinary of all remedies, it should be reserved for the most egregious instances of explicit and intentional misconduct. It is not enough to simply show inconsistencies, poor recollection, non-disclosure, mistaken beliefs, ambiguity, bad conduct, or even outright lies. *See, e.g., Bologna v. Schlanger*, 995 So. 2d 526, 528 (Fla. Ct. App. 2008) (short of clear and convincing proof of a deliberate scheme to subvert the judicial process, "poor recollection dissemblance, even lying, can by well managed through cross-examination" and explaining that a testimonial discrepancy is usually not enough). A testimonial discrepancy is usually not enough;

there should be clear and convincing evidence of a scheme calculated to evade or stymie discovery of facts central to the case. *See Bologna*, 995 So. 2d at 528 (emphasis supplied); *see also Bosque v. Rivera*, 135 So. 3d 399, 402 (Fla. 5th DCA 2014) ("The dismissal of a lawsuit for fraud on the court is an extraordinary remedy to be utilized only when a deliberate scheme to subvert the judicial process has been clearly and convincingly proved."); *Gehrmann v. City of Orlando,* 962 So. 2d 1059, 1062 (Fla. 5th DCA 2007) ("Except in the most extreme cases, where it appears that the process of trial has itself been subverted, factual inconsistencies, even false statements are well managed through the use of impeachment and traditional discovery sanctions."). In a court of law, juries are trusted to make credibility determination, resolve factual disputes, and make ultimate determinations about personal injury cases, including whether claimed injuries are genuine or not. *See Jacob v. Henderson*, 840 So. 2d 1167, 1170 (Fla. App. Ct. 2003); *Francois v. Harris*, 366 So. 2d 851, 852 (Fla. App. Ct. 1979).

## II.    Discussion

Defendants point to various excerpts of Plaintiff's deposition testimony to support their position that Plaintiff has engaged in willful, bad faith conduct that justifies dismissal of the complaint. While Defendants certainly have identified some discrepancies, inconsistencies, and even false statements in Plaintiff's testimony, Defendants have failed to show by clear and convincing evidence that Plaintiff was engaged in a deliberate scheme to subvert the judicial process.

Indeed, after reviewing the deposition transcript in its entirety, the Court is left with the impression that, at times, Plaintiff's seemingly inconsistent testimony was

explained at least in part by her misunderstanding or confusion about the question being asked.[3] And the fact that defense counsel did not have complete medical records during the depositions certainly made it more difficult for Plaintiff to recall details from medical visits that had taken place up to seven years earlier.[4] Keeping these issues in mind, the Court will discuss the testimonial concerns identified by Defendants.

First, Defendants contend that Plaintiff lied about a 2009 conviction for petit theft. (Bijou Depo. at 204:24-206:12). While Plaintiff testified that she did not recall the conviction, defense counsel did not challenge Plaintiff with a certified judgment, nor have Defendants otherwise proved the legitimacy of the purported conviction.

---

[3] For example, the following exchange occurred regarding Plaintiff's age:

Q.  Approximately how old were you when you took the medication in Fort Myers?

A.  My late 30s. In my late 30s.

Q.  How old are you currently?

A.  I don't remember.

Q.  You don't know how old you are?

A.  I'm probably in my late 30s.

Q.  But you don't know your age?

A.  Yeah. I'm 41. But I don't know exact year and how old. I probably was 38, 37.

(Bijou Depo. at 70:16-25). While counsel was clearly asking how old Plaintiff was at the time of the deposition, she appeared to think counsel was asking how old she had been when she was taking medication in Fort Myers.

[4] During the first day of deposition, defense counsel did not use any medical records in questioning Plaintiff. While counsel had more records by the second session on June 6, 2025, there were instances when she referred to bills for medical treatment dated in 2019 and simply asked Plaintiff if she recalled what they were for. (Bijou Depo. at 235:4-10).

Accordingly, Defendants have failed to establish that Plaintiff was being dishonest.

Next, Defendants take issue with Plaintiff's testimony regarding her use of marijuana on the day of the accident. Plaintiff initially testified that for two to three days before the accident occurred, she had not smoked marijuana and was sober. (Bijou Depo. at 62:9-62:17). Plaintiff explained that she didn't even have money to purchase food, so she did not have money to buy marijuana. (Bijou Depo. at 62:20-63:4). Then, on the second day of her deposition, Plaintiff acknowledged that a medical record from October 2, 2023, showed that she had used marijuana, and she then testified that she had, in fact, smoked a few hours before the accident. (Bijou Depo. at 100:1-24). While the parties disagree as to the relevance of Plaintiff's marijuana usage, Plaintiff's initial testimony was not truthful.

Defendants then point to Plaintiff's testimony that the accident occurred as she was driving back to Gainesville from Orlando after making a fake Uber delivery. This testimony—which was volunteered in response to defense counsel's query, "where were you coming from [at the time of the accident]?"—revealed dishonest and even fraudulent conduct by Plaintiff on the day of the accident. (Bijou Depo. at 25:3-29:5). Defendants, however, do not contend that the testimony was a lie or that it was given to undermine discovery about the accident in this case. At most, defense counsel identified a discrepancy as to how the money from the fake Uber drive was used—i.e., Plaintiff testified that she needed the money for groceries, but Sanjay Pruitt testified that they used the money to get food at Steak & Shake on the way home from Orlando. (Doc. 84, Sanjay Pruitt Depo. at 131:16-23). Even if this evidence is admissible at trial,

the jury is properly tasked with resolving such factual disputes and making any necessary credibility determinations.

Similarly, Defendants point to Plaintiff's testimony that when she requested pain medication on September 26, 2025 (and following the accident), she was requesting the medication for Sanjay Pruitt, who had recently severed his fingers. (Bijou Depo. at 282:18-284:5).[5] Plaintiff claims that she shared the prescriptions with Sanjay Pruitt (Bijou Dep. at 284:10-16), but he testified that she did not. (Pruitt Depo. at 105:6-19). This testimony is relevant to Plaintiff's pain, both before and after the accident, and the jury is properly tasked with resolving the factual disputes and making the necessary credibility determinations. The fact that Plaintiff admitted to lying to medical providers to obtain pain medication years earlier does not support Defendants' claim that Plaintiff is now engaged in intentional misconduct in the litigation of this case.

Next, Defendants contend that Plaintiff committed fraud regarding how the accident occurred and who is at fault for the accident. In her complaint, Plaintiff alleges that the collision was caused by the negligence of Defendant William Kidd. Plaintiff, however, testified that she did not see the accident occurring because she was asleep, fully reclined in the passenger seat. (Bijou Depo. at 97:3-99:9).[6] And she

---

[5] Defendants also note that Plaintiff testified that she reported to doctors that she was taking medication when in fact she was not. (Doc. 26 at ¶16). Defendants fail to provide a specific citation in the deposition transcript.

[6] In a related argument, Defendants suggest that Plaintiff fraudulently told medical providers how the accident occurred without disclosing that she had been asleep. Even if this happened, it is unclear how Plaintiff's report to medical providers (more than one year before filing this action)

testified that she has told Sanjay "two, three, four times" that she thought the accident was his fault. (Bijou Depo. at 117:17-21). It is not uncommon for people involved in automobile accidents to have conflicting and changing recollections of what happened. Plaintiff's credibility as a witness to the accident, as well as her statements regarding causation, are issues the jury is well-equipped to address.

Defendants also point to Plaintiff's testimony that she has not used any pharmacies to fill prescriptions in the past ten years. (Bijou Depo. at 57:6-8). While this statement is undoubtedly false, the Court is not persuaded that this testimony was offered as part of a scheme to deceive Defendants or the Court. Indeed, when initially asked about where she fills prescriptions, the following exchange occurred:

Q. Where do you fill your prescriptions at?

A. I used to go to dispensaries.

Q. Are you talking about a marijuana dispensary?

A. Yes.

Q. Anything other than the marijuana dispensary?

A. No.

Q. Well, like medication your primary gave you, I'm sure you can't get that at a marijuana dispensary, can you?

A. Yeah. But, you know.

Q. So where did you fill that medication at?

A. I just know someone that can get it for me.

---

could possibly support a claim that Plaintiff is engaged in intentional misconduct in this litigation.

> Q.   What's the name of the medication?
>
> A.   What medication?
>
> Q.   The anxiety medication that the doctor prescribed you.
>
> A.   I have it in the drawer. Do you want me to go get it?
>
> . . .
>
> Q.   And where did you fill that prescription at in Fort Myers?
>
> A.   It was –once again, it was a clinic there in Fort Myers.
>
> Q.   A dispensary clinic?
>
> A.   No, it was a regular doctor.

(Bijou Depo. at 54:8-55:25).

Just minutes later, Plaintiff was asked, "[i]n the past ten years have you used any pharmacies to fill prescriptions," to which she testified "[n]o." (Bijou Depo. at 57:6-8). Despite this isolated statement, Plaintiff then testified throughout her deposition—and not solely when presented with medical records—that she had filled prescriptions at Walgreens, CVS, and a clinic with an in-house pharmacy. (Bijou Depo. at 254:10-20; 274:6-9, 275:14-17; 313:22-314:23). To the extent Defendants believe this inconsistency is significant, they can explore it through cross-examination.

Defendants then take issue with Plaintiff's testimony regarding diagnostic tests. Specifically, when asked if she had an MRI, CT scan, or X-ray of her lower back or neck prior to the accident, Plaintiff testified that she had not. (Bijou Depo at 65:20-66:4). However, only minutes earlier, Plaintiff testified that she had, in fact, had an

MRI, CT-scan, and EMG of her lower back. (Bijou Depo. at 44:3-10). Moreover, it does not appear that Defendants have produced evidence that Plaintiff had imaging of her neck prior to the accident.[7] Accordingly, at most, Plaintiff's testimony is an inconsistency that is properly considered and weighed by the jury.

Finally, Defendants argue that Plaintiff has committed fraud regarding her medical conditions. In this action, Plaintiff claims that as a result of the accident, she sustained a new injury to her neck and aggravated a preexisting injury to her lower back.

Plaintiff testified that she did not have a neck injury prior to the accident on October 2, 2023. Defendants argue that Plaintiff's testimony is fraudulent based on a handful of medical records. They point to March 2019 treatment notes in which Plaintiff reported lower back pain with radiation to her neck and down her legs. (Docs. 26 at 12; 74; 76). In June 2022, Plaintiff had an MRI of the lumbar and thoracic spine that incidentally showed an impingement on her cervical spine at C5-6 and C6-7. (Doc. 71). One year later, on a June 8, 2023, intake form, Plaintiff rated her back pain "worse pain possible" and neck pain "very severe" and included a pain diagram with dots on the lumbar, thoracic, and cervical spine. (Doc. 81 at 11, 25). And then Plaintiff presented to Shands on September 21, 2023, complaining of chronic bilateral low back pain with bilateral sciatica and cervical pain. (Doc. 26 at 22).[8] Despite the references

---

[7] As noted below, Plaintiff had an MRI of the lumbar and thoracic spine in June 2022, that incidentally showed an impingement on her cervical spine at C5-6 and C6-7. (Doc. 71).

[8] The Court was unable to locate the actual treatment note in the cord. It is worth noting

to neck pain in these scattered medical records—all of which appear to be related to her well-documented lower back pain—the Court is not aware of any evidence showing that Plaintiff received treatment (or even that treatment was recommended) for her neck until after the crash. While these medical records may provide material for cross-examination, they do not establish clear and convincing evidence that Plaintiff was intentionally and fraudulently trying to conceal a pre-existing neck injury.

Turning to lower back pain, Plaintiff testified that her lower back pain began in 2018, after an "epidural went wrong" during the birth of her son. (Bijou Depo. at 36:19-23; 41:22-42:4).[9] While Plaintiff testified that her lower back pain completely went away after treatment at a rehabilitation center in Aventura around 2021ish (Bijou Depo. at 40:6-9),[10] she never testified (nor claimed) that she was pain-free from 2021 until the accident in this case. To the contrary, Plaintiff testified that the pain returned

---

that both parties made the Court's job much harder by their failure to clearly cite to the record. Plaintiff did not make any record citations in her response to the motion, and her counsel did not provide the Court with any at the hearing. And while Defendants provided some citations to deposition volumes or document numbers, they failed to provide specific page numbers, and in some cases the citations were incorrect. Moreover, Defendants filed their evidence on the docket in thirty separate notices. (Docs. 48, 49, 50, 51, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 73, 74, 75, 76, 81, 82, 83, 86).The docket entries provided no information about which evidence was contained in each notice, so the Court was forced to open and examine the contents of each filing in efforts to locate the evidence upon which the parties were purporting to rely.

[9] Defendants contend that Plaintiff's lower back pain started earlier, possibly linked to being shot in the abdomen in 2012. (Doc. 26 at 11). They cite to a February 2019 treatment note from Lee Memorial Hospital in which Plaintiff reported in the "pain history" section that she had been experiencing back pain for 6 years, which would suggest that her back pain began in 2013. (Doc. 26 at 11). Plaintiff, however, subsequently amended the pain history to state that she had been having the back pain since the birth of her child in May 2018. (Doc. 26 at 12).

[10] The parties have not submitted records from the Aventura rehabilitation center and Plaintiff was uncertain about the dates of her therapy—she testified that she was there in "'20—I think '21 or '22. '21? If I had to guess, "21. Around '21, I think.  probably in 2021." (Bijou Depo. at 37:19-40:13).

when her son told her he had been molested, and she moved a whole U-haul by herself. (Bijou Depo. at 40:14-41:13). And Plaintiff testified at length about her lower back pain history, treatments, medications, and even disability status for lower back pain prior to the accident.

Nevertheless, Defendants argue that Plaintiff testified that she was feeling fine on the day of the accident based on the following exchange:

> Q.   Okay, did you have any medical conditions? I know you were tired, but other than being tired did you have any other medical conditions on the day of the accident.
>
> A.   No.

(Bijou Depo. at 97:8-12). Given the entirety of Plaintiff's testimony, this argument is not persuasive (and bordering on the ridiculous). Even if Plaintiff was testifying that she had no lower back pain on that day—an interpretation that the Court seriously questions—that testimony, standing alone, fails to prove that Plaintiff was trying to evade discovery about her pre-existing lower back pain.

While Plaintiff's testimony raises issues as to her reliability and credibility as a witness, it does not support dismissal of her complaint for fraud, which is the most extraordinary remedy available. Plaintiff's inconsistent (and at times dishonest) testimony can—and should be—addressed through cross-examination, with the jury making credibility determinations, resolving factual disputes, and making ultimate findings regarding causation and Plaintiff's claimed injuries. Accordingly, I submit that Defendants' motion to dismiss for fraud (Doc. 26) should be **denied**.

**Recommended** in Ocala, Florida on March 2, 2026.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:
Counsel of Record

- 12 -